UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON

**CIVIL ACTION NO. 05-132-DLB**

**TOM MCQUEEN, ET AL.**                                                                                           **PLAINTIFFS**


vs.                                    **MEMORANDUM OPINION & ORDER**


**CITY OF DAYTON,**
**KENTUCKY, ET AL.**                                                                                              **DEFENDANTS**

*******************************

## I.     INTRODUCTION

Plaintiffs, Tom and Valerie McQueen, bring this action pursuant to 42 U.S.C. § 1983, alleging deprivation of free speech and press under the First Amendment. Plaintiffs also allege various state law claims for abuse of process, malicious prosecution, libel, and intentional infliction of emotional distress.[1] This matter is before the Court upon Motions for Summary Judgment by Defendants City of Dayton, Kenneth Rankle, and Mark Brown (Doc. # 40), as well as by Defendant John Fischer (Doc. # 41) (collectively "City Defendants").[2] Plaintiffs have filed a collective Response (Doc. # 58) to both motions, to

---

[1] Plaintiffs' Complaint alleges six counts, three of which (I, II, and VI) are alleged against both the City of Dayton and named employees thereof, in both their individual and official capacities. The three remaining counts (III, IV, and V) are alleged against Defendants Carla and Ron Woods. The latter Defendants having not moved the Court for summary judgment, only counts I, II, and VI are currently before the Court.

[2] Defendants City of Dayton, Kenneth Rankle, and Mark Brown are represented in concert. Defendant, and attorney, John Fischer is before the Court *pro se.*

-1-

which Defendants filed separate replies (Docs. # 60, 61). The time for filing of dispositive motions having expired, the motions are now ripe for the Court's review.

## II. FACTUAL BACKGROUND [3]

Plaintiff, Valerie McQueen, was the sole member of Burke Publishing, LLC, d/b/a The River Cities Beacon ("Beacon"). The Beacon was a weekly newspaper started by Mrs. McQueen in the spring of 2004 with local coverage of Dayton and Bellevue, Kentucky. In addition to her sole ownership of the publication venture, Mrs. McQueen was also the publisher of the Beacon as well as an editor. John Spafford, who had previous journalism experience, was hired as the "Managing Editor." Plaintiff, Thomas McQueen, Valerie McQueen's husband, was neither an owner nor employee of the Beacon. As a free weekly newspaper, the Beacon's revenue stream was generated through advertisements with local businesses. The Beacon did not enter into recurring contracts for advertising, but rather the advertisements were placed on a week-by-week basis.

Defendant, Kenneth Rankle, is the Mayor of the City of Dayton, Kentucky. Defendant, Mark Brown, was Dayton's Chief of Police during the relevant time period.[4] Defendant, John Fischer, is the City Attorney for Dayton. Defendants Carla and Ron Woods were the owners and operators of the Dayton Dispatch, a weekly community newspaper. The Woods purchased the newspaper in 2002. The Dayton Dispatch has

---

[3] Although the facts of this case are lengthy and the "incidents" numerous, the narrow scope of the motions before the Court on summary judgment, implicating only Plaintiffs' First Amendment and abuse of process claims, renders the majority of the facts legally irrelevant and largely unnecessary for context.

[4] Defendant Brown has since resigned and is no longer employed as the Chief of Police in the City of Dayton.

been owned by others throughout its history but, although it had other names, the Dispatch has essentially maintained the same form.  The City of Dayton had a long-standing agreement with the Dispatch to pay a lump sum each month for space to place articles about the operation of the City and other events.

After operating alongside and in competition with the established Dayton Dispatch for nearly a year, Plaintiffs' venture, the Beacon, closed publication in January of 2005. Plaintiffs place at least part of the blame for the downfall of the Beacon on the actions of the City Defendants.  However, as Plaintiffs concede, Mr. and Mrs. McQueen were having marital problems during the relevant time period of the Beacon's closing.  In an e-mail dated January 17, 2005, Mrs. McQueen wrote to the Beacon's Managing Editor, Mr. Spafford, stating as follows: "As publisher/owner of the River Cities Beacon, I have decided to place the paper on hiatus until certain internal problems are resolved.  Please feel free to take down the web-site, if you wish."  (Valerie McQueen Depo., 4/13/06, Doc. # 43-7, Exh. 25).  Only two minutes subsequent, Mrs. McQueen followed up by sending Mr. Spafford an additional e-mail, which stated:

> In case you didn't understand that last email.  I have decided to put the paper on hiatus in order to deal with problems.  The paper will be back up, have no fear of that.  I just need a breather until I can get my rear in gear about Tom and my relationship.  Yes, it's been hell and it's been heaven.  I just need to buy myself a little more time.

(Valerie McQueen Depo., 4/13/06, Doc. # 43-8, Exh. 26).  In her deposition testimony, Mrs. McQueen confirmed that her reason for temporarily stopping publication of the Beacon in January of 2005, which turned into a permanent closing of the Beacon, was to deal with the newspaper's internal problems, namely "to decide whether [she] wanted to continue

believing [Mr. Spafford] or believe [Mr. McQueen]." (Valerie McQueen Depo., 4/13/06, Doc. # 43, p. 42).

Despite Mrs. McQueen's stated reasons for the closing of the Beacon, Plaintiffs maintain that the actions of the City Defendants adversely affected the operations of the Beacon, and, in turn, violated Plaintiffs' First Amendment rights. Plaintiffs point to several incidents in this respect, many of which are not relevant to Plaintiffs' First Amendment claim and, although included in the factual recitation, are not cited by Plaintiffs as support for their claim. The two primary incidents referenced by Plaintiffs include the contacting of local businesses by the City Defendants and a town meeting addressing the Beacon.

In September of 2004, Mayor Rankle spoke with tellers at Provident Bank in Bellevue, Kentucky, where he and his wife do their personal banking. Rankle's conversation with the bank manager regarded taking his account out of the bank if they continued to allow the Beacon to be placed in the bank for distribution. Rankle's request was based on grounds that the Beacon was publishing false and/or misleading stories about the operations of the Dayton government. It is undisputed that the City of Dayton does not have an account with Provident Bank (n/k/a National City Bank), as the City of Dayton banks with the Bank of Kentucky. Defendant Rankle also spoke to the owner of Gold Star Chili in Bellevue, Kentucky. Rankle is personally acquainted with the owner. The City of Dayton does not do official business with Gold Star Chili. Defendant Rankle testified that he has two identifies, one as Mayor of Dayton and the other as a citizen. He maintains

that the conversations he had with business owners in regards to his concerns about the Beacon were strictly in his personal capacity.[1]

On October 28, 2004, a community forum was organized to discuss concerns about the Beacon. The forum was purportedly organized by two private citizens, Karen Strictly and William Burns. A flyer advertising the meeting was distributed throughout the city, presumably by private citizens, and contained the following information:

**Attention!**

All Citizens Who Live, Work or Own A Business In the City of Dayton...

\* Are you sick of the <u>Constant Attacks</u> upon our City and our residents that are published weekly by The River Cities Beacon newspaper?

\* Are you tired of seeing the image of our City being tainted by The River Cities Beacon stories that are generated by "A Source, An Unnamed Person, or Name Withheld?"

*If so, please attend the community forum on:*

DATE:         Thursday, October 28, 2004
TIME:          7:00 p.m.
PLACE:       First Presbyterian Church Hall
                    8th & Ervin Terrace

Organized by the Citizens of Dayton, Kentucky, for the purpose of voicing concerns and issues, as well as truth, in regard to inaccurate and unfair reporting methods utilized by The River Cities Beacon newspaper, and their malicious attacks against our City and our Citizens.

(Doc. # 47-4).

Plaintiffs did not attend this forum. Mayor Rankle and Police Chief Brown were in attendance at the meeting, but did not conduct the forum. City Attorney Fischer testified

---

[1] Similarly, in August of 2004, Defendant Fischer, City Attorney of Dayton, sent letters to business owners in Dayton expressing concerns about the Beacon and threatening to stop patronizing the businesses. The letters were not on City letterhead and did not mention Fischer's position with the Dayton government. Like Mayor Rankle, Fischer maintains that his contact with businesses was in his individual capacity and did not involve the Dayton government.

that he was not in attendance. Rankle was the only Defendant to speak at the forum. He informed the attendees that he had personally encouraged his bank and Gold Star Chili to stop distributing the Beacon. Several individuals, in addition to Mayor Rankle, spoke at the forum and expressed their concerns about the Beacon, and the purported negative light in which it was placing the City of Dayton. No actions were taken against the Beacon or Plaintiffs as a result of the town meeting.

### III.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).

Once the movant has met its initial burden of establishing that summary judgment may be appropriate as a matter of law, the non-movant cannot rest on its pleadings but must instead demonstrate that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir. 2006). If a reasonable jury could not

return a verdict for the nonmoving party based on the evidence construed in its favor, summary judgment should be granted to movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

## IV.   ANALYSIS

### A.   First Amendment Claim

Plaintiffs allege violations of their rights to free speech and press afforded under the First Amendment to the United States Constitution. Plaintiffs assert their cause of action against the City Defendants pursuant to 42 U.S.C. § 1983, which authorizes courts to "redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law." *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (quoting 42 U.S.C. § 1983). Section 1983 "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). To that effect, "to establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

Accordingly, before liability for an alleged constitutional deprivation can be assessed, the threshold determination in any § 1983 inquiry is whether a defendant acted under "color of state law" in perpetrating the alleged violative conduct. *See Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)) ("It is axiomatic that the conduct allegedly causing the deprivation of a

constitutional law must be 'fairly attributable' to the state."). "The traditional definition of acting under color of state law requires that the defendant . . . exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49-50 (1988). In other words, an official "acts under color of state law when he abuses the position given to him by the state." *Id.* at 50.

Here, Plaintiffs' cause of action surrounds individual allegations against all three City Defendants, although the collective theme of the allegations is the purported motive of shutting down the Beacon's publishing efforts. The primary conduct alleged by Plaintiffs, and undisputed by Defendants, involved the contacting of local businesses to stop carrying the Beacon and a "town meeting" solely dedicated to concerns about the Beacon. In adjudicating whether the City Defendants – namely Mayor Rankle, Police Chief Brown, and City Attorney Fischer – acted under the color of state law when speaking out against the Beacon, "[t]he key determinant is whether the actor intend[ed] to act in an official capacity or to exercise official responsibilities pursuant to state law." *Waters*, 242 F.3d at 359. "Logically, then, not every action undertaken by a person who happens to be a state actor is attributable to the state." *Id.*

Public officials possess the same First Amendment rights afforded to every other private citizen. *See Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006) ("[T]he Court has recognized that a citizen who works for the government is nonetheless a citizen."); *see also Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991). This recognition holds no more true than when officials exercise these rights in their individual capacities. Just as Plaintiffs' right to criticize the City of Dayton via publication of the Beacon was

jealously guarded by the First Amendment, so too was the right of the Defendants to criticize the Beacon for what they believed to be false or misleading content directed at the City. *See id.* at 1015 ("We do not see why government officials may not vigorously criticize a publication for any reason they wish. As part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate.").

Plaintiffs do not allege that the City of Dayton, or any official thereof, took tangible action against the Beacon in an attempt to restrain its publication. In fact, Plaintiffs do not suggest that any official action was ever taken with regard to the Beacon beyond the mere rhetoric of officials, which does not approach the form of state action contemplated by constitutional jurisprudence. *See id.* ("And the Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."). Instead, Plaintiffs' allege only that the influence possessed by the Defendants, as widely-known city officials, was enough to transform their speech against the Beacon into state action.

It is insufficient, however, for Plaintiffs to rely solely on the theory that, even absent invocation of official powers or threats based thereon, mere communal knowledge of the Defendants' positions as City of Dayton officials renders the conduct as taken under color of state law. *See Screws v. United States*, 325 U.S. 91, 111 (1945) ("It is clear that under 'color' of law means under 'pretense' of law" and, thus, "acts of officers in the ambit of their personal pursuits are plainly excluded."). Taking Plaintiffs' arguments to their logical conclusion, especially considering the minimally invasive actions of Defendants in this

-9-

case, it would follow that government officials would never be free to exercise any individual rights as a consequence of their official capacities. In other words, "[i]f the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized." *Penthouse*, 939 F.2d at 1015. "Accordingly, a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters*, 242 F.3d at 359.

In turning to the individual allegations against each Defendant, it is clear, therefore, that the record fails to support Plaintiffs' cause of action as to any of the Defendants because state action is absent. First, as to Police Chief Brown, Plaintiffs offer two sentences as to Brown's involvement in this case, stating that: "Defendant Brown attended the meeting at the Church along with several other City leaders. When [Plaintiffs] tried to file police reports [for an incident on their property], Brown refused to proceed." (Doc. # 58, p. 18). It is self-evident that a city official's mere presence at a citizen-organized town meeting, which was for purported security reasons only, does not give rise to an actionable claim for a constitutional tort of any kind, let alone a First Amendment violation.[2]

Second, Plaintiffs' claim against City Attorney Fischer is based not only on his speculated attendance at the town meeting, but also on his contact with local businesses about the Beacon.[3] Fischer acknowledges writing letters to local businesses and, along

---

[2] Plaintiffs' allegations with respect to the police report are not relevant to the First Amendment claim. Regardless, Defendants attach a copy of the "missing" police report. (Doc. # 40-13).

[3] The record does not support Plaintiffs' apparent assumption as to Fischer's presence at the meeting. The only evidence before the Court on this point is a deposition statement made by Police Chief Brown who, in response to a question about Fischer's attendance, stated: "I don't specifically recall, but he may have been there." This statement has no probative value, as anyone *could* have been there. As in the case of Police Chief Brown, however, even assuming Plaintiffs'

-10-

with Plaintiffs, attached said letters as part of the record.  However, the letters sent by Fischer did not indicate his affiliation with the City of Dayton.  The letters were not on City letterhead and Fischer did not sign the letters as City Attorney.  Moreover, the substance of the letters never even alluded to Fischer's position with the City.[4]  Plaintiffs again rely solely on the presumption that Fischer's prominence in the City led the business owners to give Fischer's complaints about the Beacon more weight than an ordinary citizen would garner.  Whether or not Fischer's position ultimately affected the level of influence behind his speech, he took affirmative steps to insure that his complaints were not misconstrued

---

allegations as true for summary judgment purposes, Fischer's presence at the meeting is not actionable in and of itself absent any allegations of action taken against Plaintiffs and the Beacon in his capacity as City Attorney.

[4] Both parties attach only two letters written by Fischer, addressed to The Fairfield Coffee Company and Schneider's Sweet Shop, which read:

> Dear Owner,
>
> Until recently, I had been an occasional customer of your shop.  I thought you should know why I do not patronize your business at this time.  I noticed that you are a regular advertiser in the River Cities Beacon.  I feel that that publication constantly, and with bias, attacks the cities of Bellevue and Dayton and the hardworking elected city leaders who volunteer their time to do the best they can in running city government.  What's worse, I believe they began these diatribes because they failed in wresting the cities' publication business from the publications they wish to replace.
>
> I am writing to all the businesses which I have previously used to let them know they will not be seeing me until they stop advertising in that paper or until their tirades end.  As a lone individual, I do not expect that to have much effect, but I have heard many complaints from individual citizens about the Beacon and I wonder how many others are not supporting their advertisers without mentioning it to the business owner.
>
> Thank you, and I hope to be able to patronize you again in the near future.
>
> <div align="right">Very truly yours,<br>John C. Fischer</div>

(Docs. # 58-3, 58-4).

as official action, including the statement that "as a lone individual, I do not expect [my decision to stop patronizing your business] to have much effect." Consequently, the record establishes that Fischer did not act under the color of state law and a reasonable jury could not conclude otherwise.

Third, it is undisputed that Mayor Rankle both spoke at the town meeting and visited local businesses to voice concerns about the Beacon. Although Mayor Rankle visited businesses in person, rather than writing letters as done by City Attorney Fischer, Plaintiffs do not allege that Rankle did so in his official capacity. Instead, Plaintiffs once again allege only that Rankle's influence as Mayor in the "Mayberry type town" was sufficient to color his actions with state authority. The record establishes that Rankle visited restaurants and threatened to withdraw his personal business. Rankle also visited his personal bank where the City of Dayton did not have any accounts. In either case, Plaintiffs offer no evidence that Rankle ever made any threats pertaining to City business.

Similarly, when Mayor Rankle spoke at the town meeting, he criticized the Beacon and even mentioned his personal efforts to stop local businesses from carrying the paper, but the record is again devoid of any evidence, or even allegation, that Mayor Rankle used his position to exert influence beyond the unavoidable reality that local citizens will likely know Rankle's position in the government and treat him accordingly. In fact, the only facet of Rankle's, or any of the Defendants', conduct that creates a nexus to the City is the reason for the Defendants' criticism of the Beacon, which arose because of the Beacon's purported unfair criticism of the City's operations. Accordingly, although the record demonstrates that Mayor Rankle was the most "active" of the City Defendants in terms of speaking out against the Beacon, Rankle's conduct did not constitute state action and,

therefore, is not actionable under § 1983. *See Waters*, 242 F.3d at 359 ("The key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law. Logically, then, not every action undertaken by a person who happens to be a state actor is attributable to the state.").

Finally, assuming arguendo that any of the City Defendants acted under color of state law to even some, albeit limited, degree, the paucity of proof submitted by Plaintiff as to the question of whether the alleged conduct created any unconstitutional impediment to the exercise of Plaintiffs' rights under the First Amendments renders the § 1983 claim even more tenuous.[5] *See Block v. Meese*, 793 F.2d 1303, 1313 (D.C. Cir. 1986) ("We know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content."). Plaintiffs fail to adequately articulate any correlation between the actions of Defendants and the First Amendment rights of Plaintiffs, beyond mere conclusory legal argument and normative rhetoric. *See Penthouse*, 939 F.2d at 1016 ("Whenever a government official criticizes a publication it might be thought that he or she implicitly appeals to the public not to buy, or distributors not to sell, that publication. And if the distributor refuses the appeal and the government official criticizes the distributor for its refusal, it is hard to understand how, and why, that criticism can be banned.").

---

[5] Defendants also raise a viable argument for qualified immunity that, under the circumstances, would at least require careful consideration given that proof is lacking as to whether Defendants' actions, if at all unconstitutional, constituted a breach of a clearly established constitutional right. The Court acknowledges that First Amendment rights are clearly recognized; this does not, however, necessitate a finding that Defendants' actions could be understood to be clearly violative. In other words, it would be difficult for Plaintiffs to prove that they possessed a clearly established right to be free from government officials speaking out against a private publication without taking any official action. Regardless, the Court does not reach the issue of qualified immunity because Plaintiffs have failed to establish a prima facie case under § 1983.

Moreover, in that same vein, Plaintiffs have not offered any competent evidence pertaining to causation. The only evidence in the record demonstrates that Plaintiffs, namely Valerie McQueen, made the decision to stop publishing the Beacon for reasons entirely unrelated to any negative influence exerted by the City Defendants. Plaintiffs allege that "Defendants acted with the purpose of muzzling or curbing the press, and they succeeded," but offer nothing in the way of proof that Defendants' actions caused harm to Plaintiffs. (Doc. # 58, p. 20). To the contrary, there is unrefuted evidence, however anecdotal, that the "publicity" stemming from the various incidents, although negative, acted to increase the Beacon's publication base. At the very least, the record is silent as to any harmful government action taken against the Beacon. *See Penthouse*, 939 F.2d at 1016 ("At least when the government threatens no sanction – criminal or otherwise – we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights.").

In sum, irrespective of whether Defendants' actions even implicated Plaintiffs' First Amendment rights, where state action is lacking, a cause of action pursuant to § 1983 cannot stand. *See Waters*, 242 F.3d at 359 ("Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office."). Simply put, "[f]or the purposes of a state-action analysis, there can be no pretense of acting under the color of state law if the challenged conduct is not related in some *meaningful* way either to the actor's governmental status or to the performance of his duties." *Id.* (citing *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 126 (1st Cir. 1999)) (emphasis added).

Accordingly, Plaintiffs have failed to establish a prima facie case for a § 1983 claim insomuch as a reasonable jury viewing the evidence in a light most favorable to Plaintiffs could not find that Defendants violated Plaintiffs' First Amendment rights while acting under color of state law. There being no genuine issues for trial, Defendants are entitled to judgment as a matter of law on the § 1983 claim and, therefore, Defendants' motions for summary judgment are granted.

**B.    Abuse of Process**

Plaintiffs allege an abuse of process by Defendants on grounds that Mayor Rankle influenced businesses to stop carrying the Beacon and also had the city stop repairing a flowerbed in an attempt to damage the Plaintiffs' property. In their Response to Defendants' motion, which consists of only two sentences and is devoid of any legal analysis, Plaintiffs half-heartedly attempt to maintain their abuse of process claim. Because the abuse of process claim is without any merit as a matter of law as detailed herein, said claim will be dismissed.

The essential elements of an action for abuse of process are: "(1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citing *Bonnie Braes Farms Inc. v. Robinson*, 598 S.W.2d 765 (Ky. Ct. App. 1980)). "The distinction between an action for malicious prosecution and an action for abuse of process is that a malicious prosecution consists in maliciously causing process to be issued, whereas an abuse of

process is the employment of legal process for some other purpose other than that which it was intended by the law to effect."[6] *Raine v. Drasin*, 621 S.W.2d 895, 902 (Ky. 1981).

At its core, an abuse of process claim must allege "the irregular or wrongful employment of a judicial proceeding." *Simpson*, 962 S.W.2d at 394. In *Bonnie Braes Farms Inc. v. Robinson*, the court determined that a claim for abuse of process failed on its face because the alleged abuse was merely a filing of a *lis pendens* notice, which provides notification to a party that a suit has been filed concerning a claim on their property. *See* 598 S.W.2d 765, 766 (Ky. Ct. App. 1980). The *Robinson* court held that the legal process was never invoked, stating: "[The notice] is filed without intervention of the judicial authority and brings neither the property nor any parties before the court. Since there is no process, there can be no abuse of process." *Id*.

In the case *sub judice*, the legal machinery was never invoked and there was never any form of judicial proceeding. *See Simpson*, 962 S.W.2d at 394; *Raine*, 621 S.W.2d at 902. To that effect, the allegations in the current action, which rise to no more than pejorative rhetoric and perhaps spiteful governance, did not involve any judicial intervention or court proceedings. Accordingly, the abuse of process claim is dismissed.

**C.   Vicarious Liability**

Plaintiffs invoke respondeat superior as a separate count in their Complaint to render the City of Dayton vicariously liable for the actions of the City Defendants. In light of the Court's findings as to the § 1983 claim, the City of Dayton cannot be held vicariously liable for conduct that is not actionable. Moreover, even if a constitutional violation occurred,

---

[6] "Moreover, an action for abuse of process will not lie unless there has been an injury to the person or his property. Injury to name and reputation is not sufficient." *Raine*, 621 S.W.2d at 902.

Plaintiffs have not even alleged, nor could they, that Defendants were acting pursuant to some established policy or custom in the City of Dayton pertaining to the chilling of an individual's First Amendment rights to free speech and press. Accordingly, Count VI of Plaintiffs' Complaint is dismissed.

**D.     Pendant State Claims**

The granting of summary judgment for the City Defendants and consequent dismissal of the federal § 1983 claims, as well as the related abuse of process claim, renders this Court's jurisdiction over the remaining state law claims found in Counts III-V as solely supplemental under 28 U.S.C. § 1367.

Pursuant to § 1367(c)(3), where a district court "has dismissed all claims over which it has original jurisdiction," the court "may decline to exercise supplemental jurisdiction."[7] 28 U.S.C. § 1367(c)(3). In the Sixth Circuit, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims").

Accordingly, Plaintiffs' federal claims having now been dismissed, and consistent with Sixth Circuit Authority, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this matter. Plaintiffs' state law claims against the two

---

[7] Diversity jurisdiction is not present in this case as all parties are citizens of Kentucky.

non-responsive Defendants, Ron and Carla Woods,[8] are therefore dismissed without prejudice to being re-filed in state court.

## VI. CONCLUSION

In accordance with the foregoing analysis, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

(1) Defendants' Motions for Summary Judgment (Docs. # 40, 41) be, and hereby are, **GRANTED**;

(2) Counts One, Two, and Six of Plaintiffs' Complaint be, and hereby are, **DISMISSED WITH PREJUDICE**;

(3) Counts Three, Four, and Five of Plaintiffs' Complaint be, and hereby are, **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3);

(4) All Counts having been dismissed, Plaintiffs' cause of action be, and hereby is, **STRICKEN** from the active docket of this Court; and

(5) A judgment in favor of Defendants City of Dayton, Rankle, Brown, and Fischer, will be entered concurrently herewith.

This 27th day of August 2007.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\2-05-132-McQueen (MSJ).wpd

---

[8] Despite the failure of Defendants Ron and Carla Woods to answer Plaintiffs' cause of action, Plaintiffs have not moved for default judgment.